IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MELINDA RICKS,

        Plaintiff,

  v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

        Defendant.

CIVIL ACTION FILE NO.

1:13-CV-3876-TWT-JFK

**FINAL REPORT AND RECOMMENDATION**

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision

of the Commissioner of the Social Security Administration which denied her disability

applications.  For the reasons set forth below, the court **RECOMMENDS** that the

Commissioner's decision be **AFFIRMED**.

I.   **Procedural History**

Plaintiff Melinda Ricks filed applications for a period of disability, disability

insurance benefits, and supplemental security income in December 2010.  Plaintiff

alleged that she became disabled on August 5, 2010, but later amended her alleged

onset date to July 1, 2009. [Record ("R.") at 74, 201-18]. After her applications were denied initially and on reconsideration, an administrative hearing was held on June 11, 2012. [R. at 69-70, 90-133]. The Administrative Law Judge ("ALJ") issued a decision denying Plaintiff's applications on July 11, 2012. [R. at 71-85]. The Appeals Council denied Plaintiff's request for review on July 24, 2013. [R. at 1-11]. Having exhausted her administrative remedies, Plaintiff filed a complaint in this court on November 25, 2013, seeking judicial review of the Commissioner's final decision. [Doc. 4].

## II. Statement of Facts

The ALJ found that Plaintiff has major depressive disorder, posttraumatic stress disorder, obesity, hypertension, obstructive sleep apnea, dyslipidemia, and borderline intellectual functioning. [R. at 76]. Although these impairments are "severe" within the meaning of the Social Security Regulations, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. at 76-77]. The ALJ determined that Plaintiff has the residual functional capacity to perform light work but that she was limited to simple instructions, no more than casual contact with the public and occasional contact with co-workers, and no fast paced production work.

[R. at 78].  Although Plaintiff was found to be incapable of performing any of her past relevant work, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  Accordingly, it was determined that Plaintiff has not been disabled since her amended alleged onset date of July 1, 2009.  [R. at 84-85].

The ALJ's decision [R. at 74-85] states the relevant facts of this case as modified herein as follows:

At the hearing held on June 11, 2012, the claimant testified that she was 42 years old with an eleventh grade education.  She weighed 210 pounds at a height of five feet one inch.  She indicated that 210 pounds was her normal weight.  The claimant stated that she is single and currently resides with a friend.  She worked at Waffle House for about two or three years off and on.  She indicated that she worked in 2009 for about six months and that she last worked in August 2010.

The claimant testified that when she was homeless, she could not take her medications properly and could not adhere to her diet.  She said her feet swelled for about a week or two at a time, about once every two months.  The claimant indicated that she experiences headaches once or twice a week that last two to three days.  She

3

takes her blood pressure medications to help with the headaches. She stated that she takes a water pill and has to use the restroom on a frequent basis.

The claimant testified that she was going to undergo a sleep study on June 12, 2012. She explained that she has trouble sleeping at night because of nightmares. According to the claimant, she goes to therapy three days a week at Grady Health Systems. She testified that she does not like people ordering her around. The claimant stated that her concentration is not good and that she forgets where she puts things. She reported that she used to experience crying spells about a year ago. She also mentioned that she used to have mood swings where sometimes she wants to be around people and sometimes she does not.

The claimant testified that she has arthritis in her legs. As a result, she can sit for only 45 minutes to an hour at a time. She stated that she was in special education because of reading problems, that she cannot make change, and that she has never had a driver's license. The claimant reported that she watches television during the day and that her concentration is good.

The medical evidence of record reveals that on January 9, 2009, the claimant presented at Grady Primary Care Center for a follow-up of hypertension. It was noted that the claimant weighed 336 pounds and that her blood pressure was 185/99.

4

Treatment notes showed that her hypertension was uncontrolled secondary to medical non-adherence. The claimant's assessment also included dyslipidemia and morbid obesity. (Exhibit 2F at 7-8). On May 8, 2009, a physical examination revealed that the claimant demonstrated no vision change, dizziness, stress or lower extremity swelling and no chest pain. (Exhibit 2F at 5). On February 5, 2010, treatment notes showed that the claimant's blood pressure was 245/125. A physical examination revealed that she had a regular heart rate and rhythm. Treatment notes continued to reveal that the claimant was not taking her medications. (Exhibit 2F at 3-4).

On March 10, 2010, the claimant presented at Grady Health Systems for an echocardiogram which revealed mild concentric left ventricular hypertrophy and an ejection fraction of 50-55%. (Exhibit 4F at 1-2). On November 5, 2010, the claimant presented to Irene A. Omotoso, M.D., with complaints of elevated blood pressure. Dr. Omotoso noted that the claimant was not exercising and was not adhering to a low-salt diet. Dr. Omotoso's assessments of the claimant were hypertensive urgency, no evidence of target organ damage, morbid obesity, counseled on diet and exercise, and dyslipidemia. Physical examination revealed that the claimant was well-developed and well-nourished. The claimant demonstrated normal rate, regular rhythm, and normal heart sounds. (Exhibit 5F at 1-2). On March 21, 2011, Grady records reveal

5

that the claimant was independent with activities of daily living and that she reported no pain on a scale of one to ten. (Exhibit 11F at 1). Further, treatment notes reveal that the claimant continued routine and conservative treatments at Grady Health Systems through at least April 2012. (Exhibits 14F and 15F).

Clinical notes from Florida Hall dated November 17, 2010, reveal that the claimant was diagnosed with major depression with psychotic features and global assessment of functioning of 50. On November 30, 2010, Dr. Barnett opined that the claimant was unable to work in any capacity relative to this illness. (Exhibit 6F).

On March 8, 2011, the claimant underwent a consultative psychological evaluation with Joan Kent, Ph.D. Dr. Kent diagnosed the claimant with major depression, in partial remission. Dr. Kent's report shows that the claimant goes twice a week to see a psychiatrist and reports improvement with medications and psychiatry sessions. The claimant's hearing, speech, vision, and locomotion were intact. She no longer reports suicide ideation and has not had homicide ideation or delusions. There were no current hallucinations or bad dreams reported. The claimant's memory was intact, and her judgment and insight were fair. Dr. Kent's report shows that the claimant is independent in bathing, dressing daily, feeding, toileting, and simple cooking. She shops, dusts, does dishes, cleans the bathroom, and makes her bed. She

6

also reads the Bible, listens to music, reads in the library and bookstore, and sings. The claimant reports that her current goals are to get her own place and be financially stable. She also plans to take a generalized educational diploma (GED) class at the library. Dr. Kent mentioned that the claimant wants to run a shelter for people and have services to help them train for jobs. Dr. Kent's prognosis was that the claimant could probably seek employment again given her improvement and stable church network. Dr. Kent opined that the claimant appeared capable of following simple directions but that complex ones need repetition. Dr. Kent further opined that the claimant appears capable of basic addition, subtraction, and counting money. (Exhibit 8F).

On March 18, 2011, State Agency psychologist Dr. Ndiya Nkongho reported that a mental status examination revealed that the claimant's effort was poor to fair with poor persistence. Dr. Nkongho noted that the claimant was diagnosed with major depressive disorder, partial remission by consultative examiner, Dr. Kent. On the WAIS-4, Dr. Kent noted that the claimant demonstrated a full scale IQ of 60 (verbal comprehension 63, perceptual reasoning 67, working memory 69, and processing speed 65). Dr. Nkongho found that the claimant's educational, employment, and

7

functional history was believed to substantiate a diagnosis of borderline intellectual functioning at this time.

On April 10, 2012, the claimant presented at Grady Health System Central Fulton Community Mental Health Center.  A mental status evaluation revealed that the claimant was oriented to person, situation, place, and time.  Her appearance was neat; her interaction was good; and she demonstrated normal speech and thought process.  Clinical notes also showed that the claimant demonstrated intact cognition with good judgment and good insight.  (Exhibit 14F at 25).  On May 14, 2012, a behavioral health diagnostic assessment at Grady Health System revealed that the claimant demonstrated a global assessment of functioning of 56.  Clinical notes also revealed that the claimant was diagnosed with depressive disorder, NOS, and posttraumatic stress disorder.  (Exhibit 14F at 13).

On June 8, 2012, Mary Koblasz, an advanced practice registered nurse (APRN), completed a 12.04 medical evaluation (affective disorders) of the claimant.  Ms. Koblasz stated that the claimant suffers from major depressive disorder and posttraumatic stress disorder.  Ms. Koblasz opined that the claimant's condition was disabling and prevents her from engaging in gainful employment.  (Exhibit 16F at 5).

8

Additional facts will be set forth as necessary during discussion of Plaintiff's arguments.

## III.   Standard of Review

An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See 42 U.S.C. §§ 423(d)(2) and (3).

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Id. at 1440.   "Even if the evidence preponderates against the

[Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" Phillips v. Barnhart, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).

"The burden is primarily on the claimant to prove that [she] is disabled, and therefore entitled to receive Social Security disability benefits." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). Under the regulations as promulgated by the Commissioner, a five step sequential procedure is followed in order to determine whether a claimant has met the burden of proving her disability. See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920. At step one, the claimant must prove that she is not engaged in substantial gainful activity. See id. The claimant must establish at step two that she is suffering from a severe impairment or combination of impairments. See id. At step three, the Commissioner will determine if the claimant has shown that her impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. See Doughty, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920. If the claimant is able to make this showing, she will be

10

considered disabled without consideration of age, education, and work experience. See id.

"If the claimant cannot prove the existence of a listed impairment, [she] must prove at step four that [her] impairment prevents [her] from performing [her] past relevant work." Doughty, 245 F.3d at 1278. "At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides [her] past relevant work." Id. If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. See 20 C.F.R. §§ 404.1520(a), 416.920(a).

## IV.  Findings of the ALJ

The ALJ made the following findings of fact:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since July 1, 2009, the amended alleged onset date.  (20 C.F.R. §§ 404.1571, *et seq.*, and 416.971, *et seq.*).

3.  The claimant has the following severe impairments: major depressive disorder, posttraumatic stress disorder, obesity, hypertension, obstructive sleep apnea, dyslipidemia, and borderline intellectual functioning.  (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

11

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.   The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that she is only able to understand, remember, and carry out simple instructions, she can have only casual and non-direct contact with the public and occasional contact with co-workers, and she cannot perform fast paced production work.

6.   The claimant is unable to perform any past relevant work.  (20 C.F.R. §§ 404.1565 and 416.965).

7.   The claimant was born on July 23, 1969, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  (20 C.F.R. §§ 404.1563 and 416.963).

8.   The claimant has a limited education and is able to communicate in English. (20 C.F.R. §§ 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (See Social Security Ruling ("SSR") 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2009, the amended alleged onset date, through the date of the ALJ's decision.  (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

12

[R. at 76-85].

## V.    Discussion

Plaintiff Melinda Ricks makes four arguments in support of her claim that the ALJ's decision should be reversed. Plaintiff first contends that she meets the criteria for one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [Doc. 13 at 6-9]. Plaintiff next argues that the ALJ's residual functional capacity assessment is not supported by substantial evidence and is the result of a failure to apply the proper legal standards. [Id. at 9-12]. According to Plaintiff, the ALJ also erred when he found that Plaintiff's testimony was not entirely credible. [Id. at 12-13]. Finally, Plaintiff contends that the ALJ committed error when he concluded that there was other work that Plaintiff could perform. [Id. at 13-14].

### A.    Listing 12.05C for Intellectual Disability

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. at 76-78]. Plaintiff argues that the ALJ committed error when he made this finding. According to Plaintiff, she meets the requirements of Listing 12.05C for "intellectual disability,"

13

which was previously referred to as "mental retardation." [Doc. 13 at 6-9]. The court finds Plaintiff's arguments unpersuasive.

"In order to *meet* a listing, the claimant must (1) have a diagnosed condition that is included in the listings and (2) provide objective medical reports documenting that this condition meets the specific criteria of the applicable listing and the duration requirement . . . . In order to *equal* a listing, the medical findings must be at least equal in severity and duration to the listed findings." Wilkinson on Behalf of Wilkinson v. Bowen, 847 F.2d 660, 662 (11th Cir. 1987) (emphasis in original) (citing 20 C.F.R. § 416.925). The burden is on the claimant to show that her impairments meet or equal a listing. See Curry v. Astrue, 650 F. Supp. 2d 1169, 1176 (N.D. Fla. 2009) ("The claimant has the burden of proving that his impairments meet or equal a listed impairment . . . .") (citing Sullivan v. Zebley, 110 S. Ct. 885, 891 (1990)). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Zebley, 110 S. Ct. at 891 (emphasis in original).

To meet Listing 12.05C for intellectual disability, a claimant must show that she has a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or

14

other mental impairment imposing an additional and significant work-related limitation of function[.]" 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05C. Social Security regulations provide, "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00D(6)(c). "In addition to a valid I.Q. score meeting the requirements of Listing 12.05C, a plaintiff must also satisfy the diagnostic description in the introductory paragraph of Listing 12.05C." Winston v. Barnhart, 421 F. Supp. 2d 1355, 1357 (N.D. Ala. 2006). The diagnostic description of intellectual disability/mental retardation in Listing 12.05 states, in pertinent part, "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05. Thus, the diagnostic description consists of three requirements: (1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning; and (3) the deficits must have initially manifested before age 22. See Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997) ("To be considered for disability benefits under

15

section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22."); Winston, 421 F. Supp. 2d at 1357-58.

With regard to the first requirement, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV-TR") at 41, which is consistent with the language of Listing 12.05, provides: "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below . . . ." See Winston, 421 F. Supp. 2d at 1358 ("The language of 12.05 closely tracks the DSM–IV–TR definition of mental retardation."). "Therefore, a valid IQ score of 70 or below satisfies the first requirement of the diagnostic description." Id. In a psychological evaluation of Plaintiff dated March 8, 2011, Dr. Joan Kent found that on the Wechsler Adult Intelligence Scale-Fourth Edition, Plaintiff's full scale IQ score was 60, verbal comprehension was 63, perceptual reasoning was 67, working memory was 69, and processing speed was 65. [R. at 431]. Dr. Kent found that, although Plaintiff's "[e]ffort was poor to fair with poor persistence," her "[c]urrent findings appear to be a valid measure of her ability." [R. at 430-31]. The ALJ did not specifically address Listing 12.05, but he acknowledged that Plaintiff's IQ scores,

16

including her full scale IQ score of 60, are in the range of mild mental retardation. [R. at 76-78]. <u>See Atkins v. Virginia</u>, 122 S. Ct. 2242, 2245 n.3 (2002) ("'Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70.") (citing <u>DSM-IV-TR</u> at 42-43). Because Plaintiff has a valid IQ score of below 70, she is able to show that she has significantly subaverage intellectual functioning.

As discussed *supra*, a low IQ score is not the only requirement to meet Listing 12.05 for intellectual disability/mental retardation. The ALJ correctly noted this fact in his decision when he wrote that "the IQ score, in and of itself, does not establish that the claimant has mild mental retardation." [R. at 77]. The claimant must also meet the second requirement of the diagnostic description of Listing 12.05: the presence of "deficits in adaptive functioning."[1] <u>See Winston</u>, 421 F. Supp. 2d at 1358.

---

[1]The ALJ noted that, in addition to a low IQ score, a person with mild mental retardation must have "concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." [R. at 78]. The ALJ's explanation is an accurate summary of the definition of mental retardation as provided by the American Association on Mental Retardation and the American Psychiatric Association. <u>See Atkins</u>, 122 S. Ct. at 2245 n.3 (citing <u>Mental Retardation: Definition, Classification, and Systems of Supports</u> 5 (9th ed. 1992); <u>DSM-IV-TR</u> at 41-43).

AO 72A

(Rev.8/82)

The court finds that Plaintiff has failed to make this showing and that substantial evidence supports the ALJ's finding at step three that Plaintiff did not meet the requirements of a listing.

The ALJ stated, and Plaintiff does not dispute, that no examining or treating physician has diagnosed Plaintiff with mental retardation. [R. at 78]. This is significant because ALJs are not doctors, and it is improper for them to substitute their own opinions for that of medical experts. See Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982) ("the ALJ improperly substituted his judgment of the claimant's condition for that of the medical and vocational experts"). State agency physician Ndiya Nkongho opined on March 18, 2011, that Plaintiff was functioning in the borderline range of intelligence. [R. at 438, 449]. Dr. Nkongho opined that Plaintiff's educational, employment, and functional history substantiated a diagnosis of borderline intellectual functioning. [R. at 438, 449]. Dr. Nkongho's finding was adopted by the ALJ who noted that Plaintiff's "semi-skilled work history in a variety of occupations" supported the "opinion that the claimant functions in the range of borderline intellectual functioning." [R. at 77]. The evidence in the record confirms the ALJ's statement about the skill level of Plaintiff's work history. Plaintiff has past

18

relevant work as a sales clerk, waitress, and general clerk, all of which was described by the vocational expert as semi-skilled.  [R. at 79, 84, 99-104, 129-30].

As noted *supra*, Dr. Kent examined Plaintiff on March 8, 2011, and found that her IQ scores were in the 60's.  [R. at 81, 431].  Dr. Kent diagnosed Plaintiff with major depression, in partial remission.  [R. at 80, 431].  Plaintiff reported that she sees a psychiatrist twice a week and that she had experienced an improvement in her mental health as a result of the psychiatry sessions and prescribed medications.  [R. at 80, 429, 432].  Plaintiff informed Dr. Kent that "she wants to run a shelter for people and have services to help them train for jobs."  [R. at 81, 430].  Dr. Kent found that Plaintiff's memory was intact, that her judgment and insight were fair, and that she appeared "capable of basic adding and subtraction and counting money."  [R. at 81, 430, 432].  As the ALJ explained, the report from Dr. Kent "shows that the claimant is independent in bathing, dressing daily, feeding, toileting, [and] simple cooking, [and that she] shops, dusts, does dishes, cleans the bathroom, and [makes] her bed."  [R. at 77, 429-32].  Plaintiff also reads the Bible, listens to music, reads in the library and bookstore, and attends church and Bible study.  [Id.].  Dr. Kent opined that in light of Plaintiff's improvement and church network, "she probably could seek employment again."  [R. at 81, 432].  The ALJ explained that he gave "substantial

19

weight to the medical assessments and opinions of Dr. Kent because they are well supported by the evidence of record." [R. at 81].

While Plaintiff's IQ score establishes that she has significantly subaverage intellectual functioning, she has failed to point to evidence in the record showing the presence of deficits in adaptive functioning. As discussed *supra*, such deficits are necessary to satisfy the diagnostic description of Listing 12.05 for intellectual disability/mental retardation. State agency physician Dr. Nkongho found that Plaintiff was functioning in the borderline range of intelligence, and no examining or treating physician has diagnosed Plaintiff with mental retardation. In light of these records, as well as Plaintiff's semi-skilled work history and her daily activities, the court finds that substantial evidence supports the ALJ's finding that despite Plaintiff's low IQ scores, she did not meet Listing 12.05C. See Perkins v. Comm'r, Social Security Admin., 553 Fed. Appx. 870, 873 (11th Cir. 2014) ("A valid IQ score does not have to be conclusive of mental retardation where the IQ score is inconsistent with other record evidence regarding the claimant's daily living activities and behavior.").

**B.    Residual Functional Capacity Assessment**

"The residual functional capacity is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite [her]

20

impairments . . . .   Along with [her] age, education and work experience, the claimant's residual functional capacity is considered in determining whether the claimant can work."  Lewis, 125 F.3d at 1440 (citing 20 C.F.R. §§ 404.1545(a), 404.1520(f)).  The ALJ found that Plaintiff Ricks has the residual functional capacity ("RFC") to perform light work as defined in the relevant regulations, except that she is only able to understand, remember, and carry out simple instructions, she can only have casual and non-direct contact with the public and occasional contact with co-workers, and she cannot perform fast paced production work.  [R. at 78].

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence and is the result of a failure to apply the proper legal standards.  [Doc. 13 at 9-12].  According to Plaintiff, the ALJ "did not provide a finding or rational [sic] in regard to the ability to sustain employment or the ability to perform the relevant demands of work other than social limitations."  [Doc. 13 at 12].  Plaintiff also contends that the ALJ erred when he found that Plaintiff had no episodes of decompensation.  [Id.].  The court finds that the ALJ applied the proper standards in formulating Plaintiff's RFC and that substantial evidence supports the ALJ's decision.

21

In evaluating a mental impairment, the ALJ is required to use the "special technique" dictated by the Psychiatric Review Technique Form ("PRTF") to determine the severity of the impairment and whether it meets the criteria of a listed impairment. Social Security Ruling 96-8p provides, in part:

> The psychiatric review technique . . . requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.

SSR 96-8p. "The ALJ is required to incorporate the results of this technique into the findings and conclusions." Moore v. Barnhart, 405 F.3d 1208, 1213-14 (11th Cir. 2005) (per curiam). In the present case, the ALJ applied the correct legal standard by evaluating Plaintiff's mental impairments in light of the criteria set forth in "paragraph B" and "paragraph C" of the mental disorders listings. [R. at 77-78].

The ALJ correctly noted in his decision [R. at 77] that to satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. See 20

22

C.F.R. Part 404, Subpart P, Appendix 1 §§ 12.02B, 12.04B.  The ALJ offered an extensive discussion of the medical evidence, including the reports and opinions from Dr. Kent and Dr. Nkongho, in support of his findings that Plaintiff has mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation which have been of extended duration.  [R. at 77-78].  The ALJ found that with regard to "paragraph C," Plaintiff does not meet the criteria because she has not had: repeated episodes of decompensation; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement with a continued need for such an arrangement.  [R. at 78].

Although the ALJ found that Plaintiff had no episodes of decompensation which have been of extended duration, Plaintiff argues that this finding was erroneous. Plaintiff notes that Dr. Nkongho completed a psychiatric technique form and opined that Plaintiff had "one or two" episodes of decompensation.  [Doc. 13 at 8, 12].  The deficiency in Plaintiff's argument is that she has not pointed to any evidence in the

record showing that such episodes took place.  The court likewise has found no evidence that Plaintiff had any episodes of decompensation, each of extended duration.  The ALJ explained that the "medical evidence of record does not support that the claimant experiences any problems in this area," and the ALJ was not required to adopt a finding that lacks supporting evidence.  [R. at 77-78].  Plaintiff has made no argument regarding any of the other criteria in paragraphs B or C, and the ALJ's findings are supported by substantial evidence.

Plaintiff also argues that in describing the RFC assessment, the ALJ did not provide a finding or rationale with respect to Plaintiff's ability to perform the relevant demands of work other than social limitations.  [Doc. 13 at 12].  This argument is without merit.  Plaintiff is correct that the ALJ found that she was limited socially to casual and non-direct contact with the public and only occasional contact with co-workers.  [R. at 78].  But this was not the full extent of the ALJ's assessment of Plaintiff's RFC limitations.   The ALJ also found that Plaintiff is only able to understand, remember, and carry out simple instructions and that she cannot perform fast paced production work.  [R. at 78].

Plaintiff asserts in a single conclusory statement that the ALJ did not provide a finding or rationale regarding her "ability to sustain employment."  [Doc. 13 at 12].

24

But the ALJ's decision reveals that Plaintiff's assertion is not correct.  The ALJ found that Plaintiff is capable of performing light work with a number of nonexertional limitations, and the ALJ discussed in detail the findings of medical sources such as Dr. Nkongho and Dr. Kent which supported the RFC assessment.  The ALJ, for example, noted that Dr. Kent found that Plaintiff's memory was intact, that her judgment and insight were fair, that she appeared capable of following simple directions, and that she appeared capable of basic addition, subtraction, and counting money.  [R. at 77, 80-81, 429-32].  The ALJ also cited to Dr. Kent's finding that Plaintiff could probably seek employment again given her improvement and stable church network.  [Id.].  The ALJ explained that he gave substantial weight to the assessments and opinions of Dr. Kent because they were well supported by the record evidence.

The court finds that the ALJ applied the proper legal standards in determining Plaintiff's RFC.  The ALJ used the special technique to assess Plaintiff's mental impairments and then incorporated the results of the technique into his findings and conclusions.  See Moore, 405 F.3d at 1213-14.  The ALJ also explained his reasons for the RFC assessment and offered an extensive discussion of the supporting medical evidence–evidence which "a reasonable person would accept as adequate to support

25

a conclusion." <u>Lewis</u>, 125 F.3d at 1440.  For these reasons, the undersigned finds that remand is not warranted on the basis of the ALJ's RFC evaluation.

### C.    Credibility Assessment

Plaintiff argues that the ALJ committed error when he found that Plaintiff's testimony was not entirely credible.  [Doc. 13 at 12-13].  Where a claimant's testimony, if credited, could support the claimant's disability, the ALJ must make and explain a finding concerning the credibility of the claimant's testimony. <u>See Viehman v. Schweiker</u>, 679 F.2d 223, 227-28 (11th Cir. 1982).  "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987)).  The relevant Social Security regulations provide that factors which will be considered by the ALJ in evaluating a claimant's subjective symptoms include: daily activities; location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate his symptoms; treatment received and measures used, other than medication, for the relief of symptoms; and any other factors concerning the functional limitations and restrictions due to the claimant's symptoms. <u>See</u> 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p.  "A clearly

26

articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Foote v. Chater, 67 F.3d 1553, 1562 (citing MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986)).

In support of Plaintiff's claim that the ALJ erred in evaluating her credibility, she cites specifically to the ALJ's statement that Plaintiff's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." [Doc. 13 at 13; R. at 83]. According to Plaintiff, this statement reveals that the ALJ did not apply the proper standards in evaluating Plaintiff's credibility. [Doc. 13 at 13]. There is no question that the ALJ could have been clearer and offered a fuller explanation when he wrote the above-quoted sentence about Plaintiff's self-described daily activities. However, this sentence was only a small part of the ALJ's assessment of Plaintiff's credibility. In fact, in the next sentence of his decision, the ALJ wrote, "[E]ven if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." [R. at 83]. In other parts of his decision, the ALJ evaluated Plaintiff's testimony and offered a number of reasons supported by the record for finding that her allegations were not entirely credible.

27

The ALJ explained that the treatment received by Plaintiff for her impairments is not "the type of medical treatment one would expect for a totally disabled individual" given the "essentially routine and/or conservative" nature of the treatment. [R. at 81]. In addition, the ALJ stated that Plaintiff's "allegations are disproportionate to the clinical records and tests." [Id.]. Substantial evidence supports the ALJ's finding on this issue. Plaintiff described her daily activities as being fairly limited, yet the ALJ noted that records from Grady in March 2011 "reveal that the claimant was independent with activities of daily living" and that she reported no pain. [R. at 80, 451]. The ALJ also cited to Dr. Kent's report showing that "the claimant is independent in bathing, dressing daily, feeding, toileting, [and] simple cooking, [and that she] shops, dusts, does dishes, cleans the bathroom, and [makes] her bed. She also reads the Bible, listens to music, reads in the library and bookstore and sings." [R. at 77, 429-32].

The ALJ noted that, although Plaintiff testified that she was unable to make change, Dr. Kent found that Plaintiff "appeared capable of basic adding, subtraction, and counting money." [R. at 83, 429-32]. The ALJ also pointed out that Plaintiff "testified that her concentration was not good and she forgets where she puts things. Yet, Dr. Kent's report shows that the claimant's memory was intact." [Id.]. Dr. Kent

28

found in March 2011 that Plaintiff's judgment and insight were fair, while clinical notes from Grady in April 2012 showed that Plaintiff's judgment and insight were good. [R. at 81, 429-32, 528]. Dr. Kent indicated that Plaintiff appeared capable of following simple instructions and that she probably could seek employment again. [R. at 81, 429-32].

Plaintiff informed Dr. Kent that she planned on completing her GED and that she wants to run a shelter for people and have services to help them train for jobs. [R. at 81, 429-32]. The ALJ noted these statements in his decision. Plaintiff contends that it was error for the ALJ to consider these statements but fails to explain why. [Doc. 13 at 13]. The court agrees with the Commissioner that "Plaintiff's belief that she can do these activities supports the conclusion that she can at least do the simple work detailed in the ALJ's RFC finding." [Doc. 16 at 13].

In summary, the ALJ offered numerous specific reasons for finding that Plaintiff's testimony concerning her alleged inability to work was not credible. The ALJ's clearly articulated credibility finding was supported by substantial evidence in the record, and Plaintiff has failed to show that the ALJ committed error. Accordingly, the undersigned concludes that remand is not justified on this basis. See Foote, 67 F.3d at 1562.

29

**D.     ALJ's Step Five Finding**

The ALJ is required at the fifth step of the sequential evaluation to determine whether the claimant is able to perform other work besides her past relevant work. See Doughty, 245 F.3d at 1278.  In this case, the ALJ found that, although Plaintiff could not perform her past work, there are jobs that exist in significant numbers in the national economy that she can perform.  [R. at 84].  In making this finding, the ALJ relied on the testimony of a vocational expert ("VE") who responded to a hypothetical question which described Plaintiff's limitations as found by the ALJ in his RFC assessment.  [R. at 84, 130-31].  The VE testified that a person with the limitations described by the ALJ would be able to perform such jobs as marking clerk, photo copy machine operator, and housekeeper/cleaner.  [Id.].  Plaintiff makes a brief argument that the ALJ committed error at step five because he failed to accurately account for Plaintiff's mental limitations when he assessed her RFC.  [Doc. 13 at 14].  Plaintiff's argument is not persuasive.

"At the fifth step of the sequential process, an ALJ may rely solely on the testimony of a VE in determining whether work is available in significant numbers in the national economy that a claimant is able to perform."  Hurtado v. Comm'r of Social Security, 425 Fed. Appx. 793, 795 (11th Cir. 2011) (citing Jones v. Apfel, 190

F.3d 1224, 1230 (11th Cir. 1999)).  This is precisely what the ALJ did in the present case when he solicited testimony from the VE at the administrative hearing.  "For the [VE's] testimony to constitute substantial evidence, 'the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'"  Id. (quoting Jones, 190 F.3d at 1229).   However, the ALJ is "not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." Crawford v. Comm'r of Social Security, 363 F.3d 1155, 1161 (11th Cir. 2004).  Here, the ALJ's hypothetical question to the VE comprehensively described the findings made by the ALJ in his RFC assessment, and Plaintiff makes no argument to the contrary.  [Doc. 13 at 14; R. at 130-31].  Plaintiff's contention regarding step five of the sequential evaluation is based solely on her assertion that the ALJ's RFC assessment was erroneous.  But as discussed *supra*, substantial evidence supports the RFC assessment.  Given the VE's testimony that a person with Plaintiff's limitations as found by the ALJ in his RFC assessment would be able to perform jobs that exist in significant numbers in the national economy, the court concludes that the ALJ's finding at step five was supported by substantial evidence.  [R. at 84, 130-31].

AO 72A

(Rev.8/82)

## VI.    Conclusion

Based on the forgoing reasons and cited authority, the undersigned finds that the ALJ applied proper legal standards in reaching his decision and that it was supported by substantial evidence.  See Bloodsworth, 703 F.2d at 1239.  It is, therefore, **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.  See Melkonyan v. Sullivan, 111 S. Ct. 2157 (1991).

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule 72.1, and Standing Order 14-01 (N.D. Ga. August 15, 2014).  The Clerk, therefore, is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED THIS** 19th day of May, 2015.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

32